401 P.2d 710

**R. George BRADBURY, Administrator of the Estate of George R. Bradbury, deceased, and Althea Bradbury, Plaintiffs and Respondents,**

**v.**

**Gordon L. RASMUSSEN and Yora Gene Rasmussen, his wife, Defendants and Appellants.**

No. 10055.

Supreme Court of Utah.

May 7, 1965.

Nielsen, Conder & Hansen, Salt Lake City, for appellants.

Dan S. Bushnell, Little America, Wyo., for respondents.

CALLISTER, Justice:

Defendants appeal from a judgment in favor of plaintiffs wherein the lower court declared null and void a warranty deed, a lease agreement, and a transfer of water stock certificates.

Plaintiffs, George R.[1] and his wife, Althea Bradbury, were the owners of farm land and appurtenant water rights in Sevier County, Utah. They had only one child, R. George Bradbury. However, they had reared as their daughter, defendant Yora Rasmussen, who was the natural child of a niece, whom they had also reared. After Yora's marriage to defendant Gordon Rasmussen, she moved away, but the close familial relationship continued.

For several years prior to 1960, the farm had been leased to other individuals. The son, R. George, at one time operated the farm but left to seek employment elsewhere. From 1957 through 1959, M. D. Foreman, a brother of Mrs. Bradbury, operated the farm. He advised the Bradburys that he could not continue and advised them to sell their holdings. They declined this suggestion.

In October of 1959, the Rasmussens visited the Bradburys at the farm, and there was a discussion about a possible sale of the farm to the Rasmussens for $300 per acre.

[1]. George R. Bradbury was originally a party plaintiff along with his wife, Althea, but died during the course of the litigation, and his son, R. George Bradbury, as administrator of his father's estate, was substituted as a party plaintiff.

Mr. Rasmussen stated that he would have to think the matter over. From here on the testimony of the parties as to what transpired differs substantially.

However, in the early part of 1960, the parties consulted Mr. Tex R. Olsen, an attorney, at his office in Richfield, Utah. What took place at this consultation is in dispute as between the parties. After meeting with the attorney, the Rasmussens returned to their home in Orem, Utah and the Bradburys to their farm. On a subsequent date, Mrs. Bradbury delivered to the attorney some tax notices which contained a description of the property. She had a discussion at this time with Mr. Olsen. On February 18, 1960, the Bradburys went to the office of Mr. Olsen and executed the papers which he had prepared. The Bradburys testified that the attorney merely read the papers to them and they signed the same without realizing their significance.

The papers executed by the Bradburys consisted of a warranty deed conveying their real property to the Rasmussens, but reserving a life estate to them, and a farm lease agreement wherein the Bradburys leased the property to the Rasmussens for the term of the life of the survivor of the lessors unless sooner terminated by mutual agreement.

The following day the deed and lease, together with copies thereof, were mailed to the Rasmussens. They signed the original lease and mailed it back to the attorney. About two weeks later, the Rasmussens gave the Bradburys a check for the one dollar consideration which was recited in the deed.

Shortly thereafter, Mr. Rasmussen moved to the farm and undertook its operation. His wife and family joined him at the close of the school term, and the family moved into one of the homes on the farm. The Rasmussens terminated their employment and disposed of their home in Orem.

Later, the Bradburys gave the Rasmussens three water stock certificates, together with assignments thereto which were taken by Gordon Rasmussen to the secretary of the water company who issued new certificates in the name of the Rasmussens. These certificates were turned over to the Bradburys and held by them.

The trial court made findings of fact substantially in accord with the facts outlined up to this point. It made additional findings which will be discussed subsequently.

The parties evidently lived side by side in harmony during 1960, cooperating with and assisting one another. The Bradburys financed the purchase of some cattle by the Rasmussens.

Sometime in 1961 a conflict arose between the parties. According to the Rasmussens it was in the spring that the son, R. George, learned of the transaction and shortly thereafter his parents informed the Rasmussens

382

that there would have to be some changes made. According to the Bradburys, the dispute arose in August when a man from the bank came to check the property and they became aware of the import of the papers which they had signed. However, M. D. Foreman testified that in July he had driven the Bradburys to St. George, Utah to visit their son, and that he had heard the son tell his parents that they should "fight it all the way" to get the property back.

It was the contention of the Bradburys that they thought the documents they had signed were for a contract of sale rather than a deed reserving a life estate. The case was tried before the lower court without a jury.[2] It made, among others, a finding of fact that the deed, lease and transfer of water stock were null and void for the following reasons:

(a) A confidential relationship existed between the parties thereto.

(b) The plaintiff, Althea Bradbury, and her husband, George R. Bradbury, deceased, were elderly people, with infirmities incident to age.[3]

(c) The defendants represented the transaction as being one for the sale of the farm and water stock, when, in fact, the documents purported to make a gift of such property.

(d) The transferors at no time intended to make a gift of said property.

(e) The alleged transfer of the above mentioned property was made subject to a mistake of fact on the part of the plaintiffs as to the nature of the transaction and the transfers involved.

(f) The plaintiffs were of the opinion and understanding that said transactions were for the purpose of consummating the negotiations for the sale of the property.

(g) That the transferors did not have the benefit of independent advice in connection with said transaction.

(h) By virtue of the alleged transfers of the property mentioned above, the transferors has substantially disinherited their natural born heir, being their only son, R. George Bradbury.

(i) The defendants failed to prove by clear and convincing evidence that the alleged gifts were fair, equitable, valid and free from any fraud or undue influence arising from the faith and trust reposed in them because of the confidential relationship.

2. A jury trial was originally demanded by the Bradburys but waived by them at pretrial. However, defendants refused to agree and insisted upon the case being tried to a jury. Defendants cite this as error. However, see Johnson v. Johnson, 9 Utah 2d 40, 337 P.2d 420 (1959).
3. George R. was 83 years of age, with failing eyesight, and Althea was 73 at the time the documents were executed.

Based upon the foregoing findings, the court concluded as a matter of law that the defendants in their confidential relationship, exerted undue influence upon the Bradburys and entered judgment accordingly.

 The first question to be resolved is whether the lower court erred in its determination that a confidential relationship existed between the parties, as that term is considered in its legal significance. The evidence is undisputed that there existed among the parties sincere affection, trust and confidence, but is this legally sufficient to constitute a confidential relationship giving rise to a presumption that the transaction was unfair?[4] We think not.

 The mere relationship of parent and child does not constitute evidence of such confidential relationship as to create a presumption of fraud or undue influence.[5] While kinship may be a factor in determining the existence of a legally significant confidential relationship, there must be a showing, in addition to the kinship, a reposal of confidence by one party and the resulting superiority and influence on the other party.[6] The relationship must be such as would lead an ordinarily prudent person in the management of his business affairs to repose that degree of confidence in the other party which largely results in the substitution of the will of the latter for that of the former in the material matters involved in the transaction. The doctrine of confidential relationship rests upon the principle of inequality between the parties, and implies a position of superiority occupied by one of the parties over the other. Mere confidence in one person by another is not sufficient alone to constitute such a relationship. The confidence must be reposed by one under such circumstances as to create a corresponding duty, either legal or moral, upon the part of the other to observe the confidence, and it must result in a situation where as a matter of fact there is superior influence on one side and dependence on the other.[7]

The extensive testimony of the attorney, Tex R. Olsen, contributes significantly to the determinative question as to whether

4. If a confidential relationship is shown to exist, and a gift or conveyance is made to a party in a superior position, a presumption arises that the transaction was unfair; this presumption has the force of evidence and will itself support a finding if not overcome by countervailing evidence. The burden is upon the superior party to convince the court by a preponderance (not clear and convincing) of the evidence that the transaction was fair. Johnson v. Johnson, 9 Utah 2d 40, 337 P.2d 420 (1959); In re Swan's Estate, 4 Utah 2d 277, 293 P.2d 682 (1956).

5. Froyd v. Barnhurst, 83 Utah 271, 28 P. 2d 135 (1934).

6. Newell v. Halloran, 68 Utah 407, 250 P. 986 (1926).

7. Renshaw v. Tracy Loan & Tr. Co., 87 Utah 364, 49 P.2d 403, 100 A.L.R. 872 (1934). See also Bogert, Trusts and Trustees, 2d Ed., § 482, pp. 135–139.

there was a superior influence exerted by the Rasmussens and a corresponding dependence by the Bradburys.

The first consultation with Mr. Olsen was arranged by Gordon Rasmussen and held in Olsen's office on a Sunday afternoon. It lasted one and a half to two hours and both parties were present. According to Olsen, the following transpired:

Gordon Rasmussen told him that he and his family were going to move down to the farm to operate it, and that they wanted an arrangement whereby they would be assured that the farm would not go to anyone else upon the death of the Bradburys. The Rasmussens both emphasized their desire for security if they made the move and undertook to operate the farm. The Bradburys stated that they had a general plan in mind, but nothing specific. The attorney suggested several alternatives to accomplish the desired result; one of which was a testamentary disposition, which was rejected by the parties because of its ambulatory nature. Mrs. Bradbury stated that she wanted to give "these kids" some security if they made the move. Mr. Olsen suggested the giving of a deed, reserving a life estate to the Bradburys so that the latter would be entitled to the use and income from the property so long as they lived. The attorney explained to the parties the meaning and effect of such a transaction. The "Bradburys thought this would be agreeable with them because they wanted the property to go to the Rasmussens and they wanted some assurance that they would get something out of it during their lifetime." The consultation concluded with Mr. Olsen agreeing to prepare the papers and mail them to the Rasmussens after they were signed by the Bradburys.

About two days later Mrs. Bradbury came to Mr. Olsen's office and delivered to him some tax notices which contained the legal descriptions of the farm property. At that time she asked the attorney if Yora were an heir, to which he replied in the negative. She then remarked that the other property which they might have in their names would go to their son. Mr. Olsen told Mrs. Bradbury that he would call her when the papers were ready.

At a later date, the attorney notified the Bradburys that the papers were ready to be signed. They came to his office and went over the documents with him. After telling him what they had in mind, they signed the deed and lease agreement and received copies. On this occasion, according to Mr. Olsen, the papers were discussed in detail prior to the signing with particular emphasis on the provisions concerning the life estate which the Bradburys again requested an explanation of its meaning.

Mr. Olsen also testified as to the general health and alertness of the Bradburys. He stated that Mrs. Bradbury was very alert,

but that Mr. Bradbury was advanced in years and limited in his ability to move about. Both of them participated in the discussions and advised Mr. Olsen what they desired to accomplish. Mr. Bradbury responded readily with information when so requested and helped make the decision on the instruments to be prepared.

Mr. Olsen testified that at no time during his discussion with the parties was mention made of a sale of the property for $300 per acre.

In the instant case there is no fact or circumstance to indicate a situation of trust or confidence wherein one of the parties had a commanding influence over the other; nothing indicating dominance, either personal, social, or moral. On the contrary, the evidence indicates that there was no inequality of influence in the circumstances of the transaction. Each party was free to act, and did act, upon his independent volition and will. The terms of the deed and lease appear to have been fixed and agreed upon by the Bradburys upon their independent judgment after complete apprizal by Mr. Olsen of their legal significance and the consequences thereof. The insistence by the Rasmussens that they be protected is not indicative of any weakness or dependence on the part of the Bradburys.

The fact that both parties testified that the Bradburys had confidence and trust in the Rasmussens is not sufficient to establish such a confidential relationship as to raise a presumption of unfairness in the transaction. The parties lived in distant towns and visited only occasionally. There is no evidence that the Rasmussens ever participated in the conduct of the Bradburys' business affairs prior to the transaction here in question, or in any way exerted a dominant influence in their lives.

From the facts heretofore outlined it is evident that a finding of undue influence cannot be sustained. Undue influence must be established by clear and convincing evidence.[8] On the contrary, such a finding is against the clear weight of the evidence.

It also follows from the evidence that the finding that the transfer of the property was made subject to a mistake of fact on the part of the Bradburys as to the nature of the transaction cannot be sustained. The burden of proving such a mistake was upon the Bradburys. The testimony of Mr. Olsen and the conduct of the Bradburys completely negative the possibility of a mistake.

Reversed. Costs to defendants.

HENRIOD, C. J., and McDONOUGH, CROCKETT and WADE, JJ., concur.

8. Richmond v. Ballard, 7 Utah 2d 341, 325 P.2d 839 (1958).