Eugene R. ANDREINI, Plaintiff
and Appellant,

v.

Bruce HULTGREN, M.D., R. David Beck,
M.D., and Holy Cross Hospital, a Utah
corporation, Defendants and Appellees.

No. 910173.

Supreme Court of Utah.

Sept. 17, 1993.

Matt Biljanic, Midvale, for Andreini.

J. Anthony Eyre, Robert H. Rees, Salt Lake City, for Hultgren.

Philip R. Fishler, Salt Lake City, for Beck.

David W. Slagle, Salt Lake City, for Holy Cross.

ZIMMERMAN, Justice:

Eugene R. Andreini appeals from two summary judgments dismissing his medical malpractice suit against Bruce Hultgren, M.D., an anesthesiologist; R. David Beck, M.D., an orthopedic surgeon; and Holy Cross Hospital. The dispute arose out of an operation that Andreini claims was negligently conducted and resulted in a compression paralysis of both his hands. In the first summary judgment, the trial court dismissed Andreini's claim against Hultgren because it found that his claim was time-barred by the two-year limitation period in the Utah Health Care Malpractice Act ("Act"). Utah Code Ann. § 78-14-4(1). Alternatively, the court reasoned that Andreini failed to request a prelitigation review within sixty days after serving Hultgren with a notice of intent to commence action, also required by the Act. Id. § 78-14-12(2). In the second summary judgment, the court dismissed Andreini's claims against Beck and Holy Cross Hospital because Andreini had signed a form releasing both the surgeon and the hospital from liability. We reverse both summary judgments.

■ In reviewing a summary judgment, we construe the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. E.g., *Estate Landscape v. Mountain States*, 844 P.2d 322, 324 n. 1 (Utah 1992); *Butterfield v. Okubo*, 831 P.2d 97, 99 (Utah 1992). We recite the relevant facts accordingly. E.g., *Butterfield*, 831 P.2d at 99.

On May 5, 1987, Andreini entered Holy Cross Hospital and underwent surgery on his right knee. Dr. R. David Beck, an orthopedic surgeon, performed the operation. He was assisted by Dr. Bruce Hultgren, an anesthesiologist, and several nurses employed by Holy Cross. On May 6, 1987, while still in the hospital, Andreini noticed a "pins and needles" sensation in both hands. While it is unclear from the record exactly when he noticed additional symptoms, by May 19, 1987, the date of discharge, Andreini exhibited noticeable atrophy of both hands. His discharge summary indicated that he had sustained a bilateral ulnar neuropathy, a deterioration of the nerves extending from his arms into both hands. However, the discharge summary did not suggest a cause. Andreini contends that none of the doctors or nurses made this diagnosis known to him prior to his discharge, and that, when he became aware of the diagnosis during his discharge, no one offered an explanation as to its meaning. Andreini claims that Beck told him his condition was probably the result of lying in bed or that it could be due to "heredity" or his "physical structure."

On July 2, 1987, Andreini visited Dr. Nathaniel M. Nord, who informed him that he had suffered a compression paralysis of both hands. Nord, however, did not express an opinion as to the cause. After Nord reported his findings to Beck, Beck suggested to Andreini that a second surgery be performed to correct the condition. Beck said that he would ask the hospital to waive its charges for the corrective surgery and that he would allow Andreini to make payments to cover his fee. The surgery was scheduled for July 9, 1987.

Approximately one week before the scheduled operation, a nurse apparently not associated with defendants told Andreini that the compression paralysis in his hands might have resulted from the improper strapping of his wrists during surgery.

Andreini claims this was the first time he became aware that improper strapping was a possible cause of his injury.

On July 9th, Andreini arrived at Holy Cross Hospital and was prepared for surgery. At some point between one-half to one hour before surgery was to begin, a Holy Cross employee presented Andreini with a release form and asked him to sign it. Andreini refused. The employee then arranged to have Beck talk to Andreini by phone. Beck told Andreini that he would not perform the surgery unless Andreini released both him and Holy Cross from future liability. Although visibly upset, Andreini signed the form and underwent the operation. The procedure was unsuccessful. Andreini has lost most of the dexterity in his hands and cannot perform any activity that requires grasping or holding.

On May 12, 1989, Andreini served Hultgren with a notice of intent to commence action, pursuant to section 78–14–8 of the Code. Utah Code Ann. § 78–14–8. On July 19, 1989, Andreini filed a request for prelitigation review and a copy of the notice of intent to commence action with the Division of Occupational and Professional Licensing ("Division"). On the same day, Andreini served Hultgren with the request for prelitigation review. On August 28, 1989, the Division issued an affidavit of compliance stating that Andreini had complied with the procedural requirements of section 78–14–12. *See id.* § 78–14–12. Andreini then filed a complaint in state district court on September 13, 1989.

Hultgren independently, and Beck and Holy Cross jointly, moved for summary judgment. With respect to the claims against Hultgren, the court found that Andreini's action was time-barred under section 78–14–4(1)'s two-year limitation period. The court alternatively found that Andreini had failed to follow section 78–14–12's procedural requirements by failing to file his request for prelitigation review within six-

ty days of serving Hultgren with the notice of intent. With respect to the claims against Beck and Holy Cross, the court found that Andreini had released both parties from liability and, as a matter of law, had not signed the form under duress. Andreini now appeals.

■ In reviewing a summary judgment, we affirm only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *E.g., Estate Landscape,* 844 P.2d at 324 & n. 1; *Hill v. Seattle First Nat'l Bank,* 827 P.2d 241, 242 (Utah 1992); *Brower v. Brown,* 744 P.2d 1337, 1338 (Utah 1987). In reviewing a ruling on a motion for summary judgment, we review the trial court's legal conclusions for correctness. *E.g., Malone v. Parker,* 826 P.2d 132, 133 (Utah 1992); *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

We address three issues raised by Andreini on appeal.[1] Specifically, we consider whether (i) the trial court correctly found that there is no question of material fact as to whether Andreini knew or should have known of his legal injury on or before July 2, 1987; (ii) the court erred in holding that Andreini's request for prelitigation review was deficient because it was not filed within sixty days of serving the notice of intent to commence the action; and (iii) the court correctly found that no question of material fact exists as to whether Andreini signed the release form under duress.

We turn first to Andreini's contention that the trial court erred in finding that the two-year limitation period set forth in section 78–14–4(1) had run on his claim against Hultgren. Section 78–14–4(1) states in pertinent part:

No malpractice action against a health care provider may be brought unless it is commenced within two years after the plaintiff or patient *discovers, or through the use of reasonable diligence should*

---

1. Andreini also claims that the trial court erred in denying his motion to amend his complaint to include a charge of fraudulent misrepresentation against Beck and Holy Cross. Because we reverse the trial court's grants of summary judg-

ment, we also reverse its order denying Andreini's motion to amend his complaint inasmuch as that decision apparently was premised on the earlier grants of summary judgment.

*have discovered the injury,* whichever first occurs:....

Utah Code Ann. § 78–14–4(1) (emphasis added).

The court reasoned that the limitation period for Andreini's claim against Hultgren began "to run on May 11, 1987 in that he was aware of his 'legal injury' at that date." Because Andreini did not serve Hultgren with the notice of intent to commence action until May 12, 1989, one day after the two-year period expired, the court found the claim barred. Andreini concedes that he felt a tingling sensation in his hands on May 11th, but argues that he did not know that he had suffered a *legal* injury until July 2, 1987, when he was first told that his condition could have resulted from negligence during his knee surgery. He argues that under *Foil v. Ballinger,* 601 P.2d 144, 147–48 (Utah 1979), his cause of action accrued when he first "knew or should have known" of his legal injury, and a factual question exists as to when that occurred. We agree.

■ The governing law is clear. The point at which a person reasonably should know that he or she has suffered a legal injury is a question of fact. *Brower,* 744 P.2d at 1339; *see Foil,* 601 P.2d at 147–48. Here, the central issue is whether Andreini knew or should have known of the legal injury before July 2, 1987. If he did not, his claim was not barred by the two-year statute of limitations.[2]

■ The evidence on this point conflicts. Hultgren argues that because Andreini felt a tingling sensation on the day following surgery, he was on notice that something had gone wrong during the surgery. In response, Andreini argues that he did not connect the tingling in his hands with the surgery on his knee because his doctor told him that the tingling was the result of lying in bed or his natural physical condition. This is a classic factual dispute that should be resolved by the finder of fact. Therefore, the trial court erred in granting

summary judgment on the ground that Andreini knew or should have known of his legal injury on May 11, 1987.

■ We next consider Andreini's challenge to the trial court's alternative holding that he had failed to comply with the requirements of section 78–14–12(2). That section provides, "The party initiating a medical malpractice action shall file a request for prelitigation panel review with the [Division] within 60 days after the *filing* of a statutory notice of intent to commence action under section 78–14–8." Utah Code Ann. § 78–14–12(2). Because Andreini filed his request for prelitigation review regarding his claim against Hultgren sixty-eight days after serving Hultgren with the notice of intent to commence action, the trial court held that Andreini had failed to comply with section 78–14–12(2) and therefore was barred from suing Hultgren.

On appeal, Andreini argues that his failure to meet the sixty-day requirement in section 78–14–12(2) should not preclude his suit against Hultgren because the Division issued an affidavit of compliance with the procedural requirements of section 78–14–12. We agree. A plaintiff's failure to satisfy section 78–14–12(2)'s sixty-day requirement, standing alone, does not bar the plaintiff's claim. *See Gramlich v. Munsey,* 838 P.2d 1131, 1132–33 (Utah 1992). We therefore reverse the trial court's order rejecting Andreini's claim against Hultgren on this ground.

We note that failure to satisfy the sixty-day requirement is not without consequence. If a plaintiff fails to satisfy the sixty-day requirement and the defendant brings this fact to the attention of the Division, the Division could reasonably deny the plaintiff prelitigation review. *See Malone,* 826 P.2d at 135. In the instant case, nothing in the record indicates that Hultgren claimed Andreini's untimely request for prelitigation review should divest the Division of jurisdiction or otherwise prevent Andreini's claim from being consid-

---

**2.** Hultgren does not contend that Andreini's cause of action is time-barred if it began to run

on July 2, 1987. *See* Utah Code Ann. § 78–14–8.

ered by the review panel.[3] In fact, because the Division issued an affidavit of compliance with the procedural requirements of section 78–14–12, we have every reason to believe that such a claim was not made.

Finally, we address Andreini's contention that the trial court erred when it dismissed his complaint against Beck and Holy Cross. The trial court reasoned that "the release executed by the plaintiff on July 9, 1987 released any of plaintiff's claims that he may have then had or thereafter had against Dr. Beck, the Holy Cross Hospital and its personnel." Andreini admits to signing the release form but claims that he did so under duress and therefore is not bound by its terms. He argues that he has adduced sufficient facts to entitle him to take this issue to the jury.

With respect to the legal standard for duress, the parties direct us to two Utah cases, *Heglar Ranch, Inc. v. Stillman*, 619 P.2d 1390 (Utah 1980), and *Fox v. Piercey*, 119 Utah 367, 227 P.2d 763 (1951), and to sections 175 and 176 of the Restatement (Second) of Contracts. The court order granting summary judgment against Holy Cross and Beck similarly relies on concepts from both of these cases and the Second Restatement. However, the *Heglar–Fox* standard for duress differs significantly from the Second Restatement standard, and the parties' arguments before this court reveal considerable confusion as to the appropriate legal standard for determining duress. Therefore, we take this occasion to review the law in this area and to clarify the legal standard to be applied in Utah.

Our 1951 decision in *Fox* was the first Utah case to discuss extensively the legal concept of duress. In that case, after tracing the evolution of the common law standard for duress, we adopted the then "modern rule," which was essentially the rather general rule articulated in the Restatement (First) of Contracts. Under that view, to invalidate a contract for duress, the alleged victim must show that the perpetrator committed "a wrongful act or threat which actually puts the victim in such fear as to compel him to act against his will." *Fox*, 119 Utah at 372–73, 227 P.2d at 765–66 (following Restatement (First) of Contracts §§ 492–93).[4] In *Heglar*, decided in 1980, we quoted this formulation of the duress standard from *Fox* and used it to resolve the issue then before us. 619 P.2d at 1391–92. However, we did not examine the vitality of that articulation of duress or its underlying concepts.

Two years later, in *Horgan v. Industrial Design Corp.*, 657 P.2d 751, 753 (Utah 1982), we said that the *Heglar–Fox* formulation is "not a rigid rule based on precise elements that must be satisfied in every case," but rather is "a general definition to be applied flexibly to the distinct facts of each case." We noted that the law of duress had since broadened, which made it difficult to arrive at a clear-cut definition of duress. *Id.* Nonetheless, we held that a critical factor in determining whether an alleged victim had suffered duress was whether he or she "had no other viable alternative." *Id.* at 754.

Between our decisions in *Fox* and *Horgan*, the Restatement drafters largely

---

3. We acknowledge that prior to Andreini's filing of the request for prelitigation review, Hultgren asserted that the Division did not have jurisdiction because the request had not been made. A few days later, however, Andreini made the necessary filing, to which Hultgren apparently did not object.

4. Despite its somewhat pithy formulation, the *Fox* standard becomes less clear as one reads the opinion. The *Fox* court adopted an amorphous notion of "wrongful" act, requiring that the act at least "be wrongful in the moral sense." 119 Utah at 375, 227 P.2d at 767 (citing Restatement (First) of Contracts § 492 cmt. g). The *Fox* court took a seemingly inconsistent position

as to whether the question that a victim acted against his or her will is subjective or objective or has elements of both states of mind. At one point, the opinion quotes approvingly from the First Restatement: "The test of what act or threat produces the required degree of fear is not objective." 119 Utah at 372, 227 P.2d at 765 (citing Restatement (First) of Contracts § 492 cmt. a). At another point, the court states that "there must be some objective standard," specifically, that "the threat or act [must be] of such a nature and made under such circumstances as to constitute a reasonable and adequate cause to control the will of the threatened person." 119 Utah at 373, 227 P.2d at 766.

abandoned the First Restatement's formulation of duress that we had adopted in *Fox* and followed in *Heglar* because the formulation was too general to be of much guidance to courts and parties. The drafters articulated a new test that, among other things, divided the "wrongful act" requirement into two distinct parts: duress by physical compulsion and duress by improper threat. The drafters defined the latter by adopting carefully crafted legal elements drawn from the case law of many courts. *See* Restatement (Second) of Contracts §§ 174–76 (1979). The drafters omitted the requirement that the perpetrator's actions "must arouse such fear as precludes a party from exercising free will and judgment" because "of its vagueness and impracticality." *Id.* § 175 cmt. b. They reasoned, "It is enough if the threat actually induces assent ... on the part of one who has no reasonable alternative." *Id.*

We agree with this reasoning and explicitly adopt the legal standards of duress set forth in sections 175 and 176 of the Restatement (Second) of Contracts. Our decision today is not as much a break with the past as a clarification that the Utah law of duress accords with the now prevalent view. In *Horgan*, we distanced ourselves from *Fox's* formulation and in that case, moved toward the Second Restatement position. We note that the results reached in *Fox* and *Heglar* would have been the same under the Second Restatement formulation.

For the purposes of the instant case, we consider only those sections of the Restatement necessary to determine whether the trial court erred in finding no question of material fact as to whether Andreini signed the release under duress. Section 175(1) states that a contract may be voided "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative." *Id.* § 175(1). Section 176 sets forth when a threat is "improper":

(1) A threat is improper if

. . . .

(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

(2) A threat is improper if the resulting exchange is not on fair terms, and

. . . .

(b) the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat. . . .

*Id.* § 176.

Andreini argues that he has put into issue sufficient material facts to raise a jury question as to whether Beck's threat not to perform the corrective surgery was a breach of the duty of good faith and fair dealing and therefore constituted an improper threat. He also argues that he has raised a jury question as to whether he had any reasonable alternatives to signing the release. By making these arguments, Andreini hopes to meet the requirements established in sections 175(1) and 176(1)(d) of the Restatement, which would allow him to void the release.

■ We first consider if Andreini adduced sufficient material facts as to whether defendants made an improper threat by breaching the duty of good faith and fair dealing. Under section 176(1)(d) of the Restatement, the breach of the duty of good faith and fair dealing must be "under a contract with the recipient." *Id.* § 176 & cmt. e, illus. 8–10. Therefore, to find a breach of the duty of good faith and fair dealing, there must be some type of preexisting contractual relationship. This is consistent with our case law. *See Peterson v. Browning*, 832 P.2d 1280, 1284 (Utah 1992); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985); *cf. Brehaney v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). Andreini, however, does not explicitly allege that he and defendants entered into a contract before he was presented with and later signed the release. Consequently, Andreini may not rely on an alleged breach of good faith and fair dealing to claim duress for the first time on appeal.

■ However, Andreini does make an argument that, fairly construed, appears to constitute an improper threat under section

176(2)(b) of the Restatement. Under this provision, an improper threat may be found when (i) "the resulting exchange is not on fair terms," and (ii) "the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat." Restatement (Second) of Contracts § 176(2)(b) (1979). Andreini argues that Beck improperly induced him into signing the release by promising that the corrective surgery would fully restore the use of his hands. He avers that prior to entering the hospital for the corrective surgery, Beck told him that patients with similar injuries had recovered 50% use within two weeks and 100% use within two months as a result of surgery similar to that proposed. Andreini also points to language in the release itself suggesting full recovery: "I, EUGENE R. ANDREINI, will receive surgery *to correct* ulnar nerve palsy...." (Emphasis added.) This evidence is sufficient to establish the legal possibility that the "resulting exchange"—defendants' unfulfilled promise to correct Andreini's injury exchanged for Andreini's release of all claims against defendants—is "not on fair terms" within the meaning of section 176(2) of the Restatement.

However, to avoid summary judgment under section 176(2)(b)'s formulation of an "improper threat," there must also be sufficient evidence to raise a factual issue as to whether defendants had engaged in unfair dealing and whether this significantly increased the impropriety of their threat. Andreini argues that defendants acted in bad faith by promising him that the corrective surgery would result in his full recovery while neglecting to inform him until just prior to surgery that he would have to waive any claims he might have against them.

Viewing the evidence in the light most favorable to Andreini, there is sufficient evidence to take this argument to the jury. We have already recited the evidence suggesting that defendants promised Andreini full recovery, and in Andreini's deposition, he testifies that he was not told until after he had been placed in a gown, shaved, and prepared for surgery that he would have to relinquish his rights. Andreini also testified that defendants were purposely noncommittal about the paralysis in his hands and its possible causes, even after Dr. Nord diagnosed his condition as compression paralysis. Moreover, Andreini averred that when he signed the release, his hands "were getting progressively worse" and "seemed to get worse each day." An expert affidavit submitted by Andreini indicates that time was, in fact, crucial to his recovery and suggests that Beck may have been aware that immediate surgery was necessary. Dr. Masud Seyal stated in the affidavit that "[a]fter the onset of Andreini's bilateral ulnar neuropathy, as diagnosed by R. David Beck, *prompt* surgical intervention was the recommended procedure" and the two-month delay "in performing the nerve transposition on July 9, 1987, likely denied Mr. Andreini a more substantial recovery." (Emphasis added.)

Based on this evidence, a jury could find that defendants engaged in unfair dealing that significantly increased the effectiveness of their threat to refuse to undertake the corrective surgery. This conclusion is consistent with the Restatement's official commentary. Comment "f" states that section 176(2)(b)

> is concerned with cases in which the party making the threat has by unfair dealing achieved an advantage over the recipient that makes his [or her] threat unusually effective. Typical examples involve manipulative conduct during the bargaining stage that leaves one person at the mercy of the other.

Restatement (Second) of Contracts § 176 cmt. f (1979).

Having determined that Andreini has adduced sufficient facts to raise a jury question as to whether defendants made an improper threat, we now consider if Andreini has mustered sufficient facts as to whether he had any reasonable alternatives to signing the release. Again, viewing the evidence in the light most favorable to Andreini, we think that a jury could find that Andreini had no reasonable alternatives under the attendant circumstances. *See id.*

§ 175 cmt. b. We acknowledge, as the trial court found, that Andreini could have left the hospital and that he was not in a life-threatening situation. However, there is evidence from which a jury could find that his alternatives were not reasonable. As mentioned earlier, Andreini averred that he was aware that his hands were getting progressively worse each day when he was confronted with the release and an expert affidavit suggests that immediate corrective surgery was indeed necessary to prevent further irreversible damage. When Andreini initially refused to sign the release, Beck allegedly told him that if he did not sign, Beck was "going to play hard ball" with him, which Andreini took to mean that defendants would not provide the corrective surgery regardless of who would pay for it. This evidence is sufficient to convince us that while Andreini may have had alternatives to signing the release form, there is a question of material fact as to whether those alternatives were reasonable.

We note that this analysis is also consistent with the comments to the Second Restatement. First, contrary to the trial court's apparent reasoning, the Restatement recognizes that the victim does not need to be in a life-threatening situation for a jury to find that there were no reasonable alternatives. Comment "a" to section 175 states, "Courts originally restricted duress to threats involving loss of life, mayhem or imprisonment, but these restrictions have been greatly relaxed and, in order to constitute duress, the threat need only be improper...." Restatement (Second) of Contracts § 175 cmt. a (1979). Second, the Restatement notes that duress can often result from situations in which time is of the essence, a factor that the trial court in the instant case seems to have overlooked. Comment "b" to section 175 observes that the reasonable alternative "standard is a practical one under which account must be taken of the exigencies in which the victim finds himself." *Id.* § 175 cmt. b.

Therefore, we hold that Andreini has adduced sufficient evidence to raise an issue of fact as to whether defendants' actions in procuring the release constituted an improper threat and whether Andreini had any reasonable alternatives to signing it. Consequently, Andreini has raised a jury question as to whether he signed the release under duress by improper threat under sections 175(1) and 176(2)(b) of the Restatement.

In sum, the trial court erred in (i) finding no material issues of fact with respect to whether Andreini knew he had suffered a legal injury within the applicable limitation period, (ii) interpreting the Utah Health Care Malpractice Act to bar his claim for failure to timely request prelitigation review, and (iii) finding no material issues of fact with respect to whether Andreini signed the release under duress. We therefore reverse both summary judgments and remand the matter for further proceedings consistent with this opinion.

HALL, C.J., concurs.

STEWART, Justice, concurring:

I write only to clarify the majority's statement that "[i]f a plaintiff fails to satisfy the sixty-day requirement and the defendant brings this fact to the attention of the Division, the Division could reasonably deny the plaintiff prelitigation review." While not complying with the sixty-day requirement might be a basis for the Commission to deny prelitigation review, a plaintiff may cure that noncompliance by filing and serving a new notice of intent to commence action and by filing a request for prelitigation review within sixty days from the new notice.[1] *Gramlich v. Munsey*, 838 P.2d 1131, 1133 (Utah 1992). It should also be made clear that Utah Code Ann. § 78–14–12 does not *require* the Commission to deny prelitigation review merely because the plaintiff has not complied with the sixty-day requirement.

*See Gramlich v. Munsey*, 838 P.2d 1131, 1133 (Utah 1992).

---

1. This is assuming, of course, that the plaintiff does so within the applicable limitations period.

DURHAM, J., concurs in the concurring opinion of STEWART, J.

HOWE, Associate Chief Justice, does not participate herein.